IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | |
| RAYMOND MAINOR | : | NO. 06-cr-140-01 |

MEMORANDUM

Baylson, J                                                                                          September 12, 2007

**I.     Introduction**

Defendant has moved to suppress wiretap evidence obtained by DEA during its investigation of Defendant. In Defendant's view, the actions of the government in obtaining the Court's order permitting the wiretap, as well as its actions pursuant to that authorization, violate various sections of Title III of the Omnibus Crime Control and Safe Streets Acts of 1968, 18 U.S.C. § 2510-2522 ("Title III"), thus warranting suppression of the wiretap evidence. The Defendant and the government pointed to five disputed issues at oral argument, which had been previously briefed to a certain extent, and which were further argued at the hearing. Supplemental briefs were submitted by Defendant and by the government.

**II.    Special Agent Yensan's January 19, 2007 Testimony**

DEA Special Agent Yensan's testimony related primarily to the second and fourth issues. S.A. Yensan described the process by which calls were received, recorded, and evaluated. At a meeting on February 8, 2006, monitors were presented with information, including potential code words for money and drugs, such as "stack" or "paper" for the former, and "hard" for the latter. As the interception continued, it became apparent that Defendant's organization used these

-1-

specific code words.

Two types of records are produced. Data records provide the direction of the call, the phone number of the other participant in the call, the date and time of the call, and the subscriber information (name) of the other participant if available. If the subscriber information is not available, the DEA monitoring computers would indicate "unknown subscriber." Audio records provide any audio recording associated with a phone call, including even just a dial tone, as well as a data record for that call. Some phone calls produce more than one data record because every "switch" that is activated produces its own data record. Thus, a single phone call from one city to another city in a different state might produce one audio record and several data records.

Once a call is initiated, the DEA's computer system would begin recording. There was often some silence, followed by the sound of the phone ringing. Once a phone call was answered, it could take some time for the participants in the conversation to exchange greetings before beginning the substance of their conversation. As a result, S.A. Yensan suggested it could take up to approximately one minute for someone monitoring the call to determine if the topic of conversation was pertinent to the investigation. Callers tended not to identify themselves by name. Instead, they would sometimes be referred to by nickname, but often only identified themselves as "me." As the interceptions continued, S.A. Yensan testified that it became easier to identify which phone numbers or subscribers would likely provide a material phone call.

Investigative personnel referred as "Monitors" listened to these calls, and characterized them as either pertinent, non-pertinent, or privileged. Pertinent calls related to the investigation. Non-pertinent calls did not. Privileged calls were typically between Defendant Mainor and his wife, but S.A. Yensan indicated that some calls characterized as privileged were also between

Mainor and a woman with whom Mainor has a child, but to whom he is not married. All calls were recorded, but when it was determined that a call, or at least a portion of the call, was not pertinent, the call would be "minimized," i.e., a Monitor, upon determining that a conversation was not pertinent, would stop recording the conversation. S.A. Yensan explained that the Monitor would periodically check an ongoing conversation to see if the subject matter had turned to relevant issues, but that any minimized portion of the conversation was not recorded. S.A. Yensan reviewed every recorded call. S.A. Yensan re-characterized as non-pertinent approximately 25-35 of the calls marked pertinent by the Monitors. If a call had been minimized, S.A. Yensan could not hear the minimized portions, because no recording had been made.

S.A. Yensan had to produce 10-Day Reports given to Judge Baylson detailing the reports generated by the wire tap. These reports did not distinguish between audio records and data records. In this way, the total number of records in a 10-Day Report may include more records than actual phone conversations recorded by the DEA, since a single conversation may have multiple data records, and because not all data records are associated with an actual conversation.

### III.   Issues presented by Defendant's Motion to Suppress

#### A.   Proper Authorization

The first issue is the purely legal question of whether citation, in the government's wiretap application, to an expired Attorney General Order warrants suppression of the wiretap when the application was authorized by a Deputy Assistant Attorney General acting under the authority of the current Attorney General Order. The parties rested on their briefs at oral argument, and provide short summaries of their main points in the supplemental briefs. It is not disputed that the government's application to this Court for authorization to intercept Mainor's

telephone calls identified Attorney General's Order Number 2407-2001 as the order pursuant to which the official of the Criminal Division of the Department of Justice was authorized to grant approval to make such an application.  Defendant argues that since Order Number 2407-2001 expired on February 25, 2005, the government's wiretap application, submitted on February 6, 2006, violates the requirements of 18 U.S.C. § 2516(1), meriting suppression under 18 U.S.C. § 2518(10)(a)[1] of the evidence obtained through the wiretap.  However, Defendant ignores the government's position that a valid Attorney General Order did, in fact, exist at the time the authorization for a wiretap application was submitted to this Court.  Moreover, the government submitted the valid order to this Court, Attorney General Order Number 2758-2005, at the time the application for the wiretap was made.

Title III provides that the Attorney General, or a specially designated subordinate, may authorize an application to a federal judge of competent jurisdiction for authorization to intercept wire or oral communications.  18 U.S.C. § 2516(1).  An application authorized by a Department of Justice official who is not the Attorney General or a designated Assistant Attorney General, violates Title III, and warrants suppression of wiretap evidence.  United States v. Giordano, 416 U.S. 505 (1974) ("Congress intended to require suppression where there is failure to satisfy any

---

[1] 18 U.S.C. § 2518(a) provides, in relevant part:
> Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—
> (i) the communication was unlawfully intercepted;
> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
> (iii) the interception was not made in conformity with the order of authorization or approval.

of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.")  In United States v. Chavez, 416 U.S. 562 (1974), however, the Supreme Court found that "misidentification of the officer authorizing the wiretap application did not affect the fulfillment of any of the reviewing or approval functions required by Congress."  Id. at 575.  Thus, when the Assistant Attorney General was erroneously identified as the official authorizing a wiretap, but the Attorney General himself had actually given the approval, the interceptions were not unlawful within the meaning of § 2518(10)(a)(i).  Id. at 579.

Like Chavez, the instant case presents no grounds to suppress the wiretap evidence under 18 U.S.C. § 2518(10)(a)(i).  In Chavez the application named the wrong official at the Department of Justice as authorizing the application; however, the application had been approved by a statutorily acceptable official (namely, the Attorney General himself).  See Chavez, 416 U.S. 562.  Here, although the application cites an expired Attorney's General Order authorizing the Deputy Assistant Attorney General to approve the wiretap application to this Court, the authorizing official in fact had authority pursuant to a valid Attorney General's Order, Order Number 2758-2005.  Moreover, while the application to this Court cited the expired Order, the Deputy Assistant Attorney General's authorization accompanying that application cited the current, valid Order.  "In no realistic sense, therefore, can it be said that the order failed to identify an authorizing official who possessed statutory power to approve the making of the application."  Id. at 574.

B.     **Minimization of the Audio Records**

The second issue relates to the minimization of phone records, and whether the DEA minimized them according to this Court's order. Title III requires that all phone conversations be minimized. 18 U.S.C. § 2518(5). However, "the statute does not forbid the interception of all nonrelevant conversation." United States v. Hull, 456 F.3d 133, 143 (3d Cir. 2006) (quoting Scott, 436 U.S. at 140). In Scott v. United States, 436 U.S. 128 (1978), the Supreme Court held that in determining whether minimization was sufficient, a court's duty "is objectively to assess the agent's or officer's actions in light of the facts and circumstances confronting him at the time without regard to his underlying intent or motive." Id. at 129.

Defendant argues that the records obtained from the government do not contain any "dead air," making it impossible to verify the government's minimization claims. Defendant claims, without citation to supporting evidence, the government appears to have "first recorded all of the telephone conversations in their entirety and then subsequently minimized them." (Def.'s Memorandum of Law in Support of Def.'s Supplemental Omnibus Motion to Suppress Wiretap and Video Surveillance Evidence, 6.) Contradicting Defendant's assertion, Special Agent Yensan testified that the time, at which investigators began to minimize and ended minimization, was recorded for every non-pertinent conversation, and that the lack of "dead air" is due to the fact that no recording is made when a monitor is not listening to the conversation. Thus, the lack of "dead air" reflects a characteristic of the recording equipment used by investigators rather than evidence of post-hoc minimization of the recordings. There is no evidence to support Defendant's claim that the recordings were not properly minimized.

### C. Inflation of the Number of Intercepted Phone Calls

Defendant claims the government misrepresented the number of calls it intercepted by not differentiating between an audio record and a data record. Audio records, as the name implies, provide a recording of all the sounds produced by a phone call, including dial tones and actual conversation. As Special Agent Yensan explained in his testimony, a data record provides information such as the direction of a call, the phone number of the other party to the call, and the date and time of the call. For calls between states, more than one data record may be produced. Thus, a single audio record will be associated with at least one data record, and possibly with multiple data records. In addition, data records may be produced even without an audio record, as a result of activity such as incomplete calls, text messages and unanswered calls.

Defendant argues that since there is always at least one data record associated with a voice record, and since many data records may not correspond to any recorded conversation, a list of all records severely over-represents the number of relevant calls DEA was intercepting. As evidence, Defendant points to his phone bills, which reflect fewer calls than indicated by the government. The government responds that the Ten-Day Reports accurately reflect the activity of Defendant's phone, notwithstanding inconsistencies with the records from the phone company. According to the government, data records reflect certain activity which would not appear on a phone bill. Indeed, although the Second Ten-Day Report (Govt.'s Response to Def.'s Motion to Suppress Wiretap and Video Surveillance Evidence, Ex. B.), for example, claims a total of 854 intercepted calls, the report also clearly states that only 89, 41 and 20 of those calls were classified as pertinent, minimized and privileged, respectively.

A Ten-Day Report "is not an account of what had been learned in the previous [ten] days,

so much as a statement indicating the need of the government to continue the surveillance." United States v. Vento, 533 F.2d 838, 853 (3d Cir. 1976). "'The sufficiency of these reports (is) a matter for the supervising judge, and the breadth of his discretion must be viewed in light of the fact that he could . . . have dispensed with progress reports entirely.'" Id. at 853-854 (quoting United States v. Iannelli, 477 F.2d 999, 1002 (3d Cir. 1973), *aff'd*, 420 U.S. 770 (1975)).

### D. Conversations Which Allegedly Did Not Take Place

Defendant claims that the Assistant United States Attorney ("AUSA") who prepared summaries of phone conversations for the Ten-Day Reports included summaries of conversations not reflected in the Defendant's phone records. For example, Defendant notes that while the AUSA refers to calls taking place on February 17, 2006 at approximately 9:30 p.m., the records from the phone company do not indicate any such calls. Comparing the relevant Ten-Day Report with the phone records, the Second Ten-Day Report refers to telephone calls occurring on February 17, 2006 at 9:25 p.m., 9:28 p.m. and 9:31 p.m. between the target telephone and two other phone numbers. The record from the phone company, however, indicates calls between the target phone and the numbers in the Second Ten-Day Report as occurring on February 17, 2006 at 9:30 a.m., 9:33 a.m. and 9:36 a.m. (See Govt.'s Response to Def.'s Motion to Suppress Wiretap and Video Surveillance Evidence, 5.)

At oral argument, and in its supplemental brief, the government argues that exactly matching the time of a call on a Ten-Day Report to the time indicated by the phone company's records is not required because the importance of the report is that it informs the supervising judge as to the nature of the conversations being intercepted. As noted above, the purpose of the Ten-Day Report is to allow the supervising judge to determine whether surveillance should

continue. Given that Defendant complains of relatively few discrepancies, and that none of the discrepancies relate to the drug-related content of the conversations detailed in the Ten-Day Report, it does not appear that any of the purported misrepresentations had a material effect on the import of the Ten-Day Report, namely, that to show that the surveillance was bearing fruit and should be continued.

E.   **Notice of the Wiretap**

The fifth issue is whether the government gave proper notice of the wire tap to Defendant. The judge issuing the authorizing order must cause to be served on the persons named in the order, no later than 90 days upon termination of the period of the authorized wiretap, an inventory containing notice of (1) the fact of the entry of the order or the application; (2) the date of the entry and the period of authorized, approved or disapproved interception, or the denial of the application; and (3) the fact that during the period wire, oral, or electronic communications were or were not intercepted. 18 U.S.C. § 2518(d)(8). Defendant argues, since authorization of the interception terminated on March 9, 2006, and notice was not served until January 16, 2007, 312 days after termination of the interceptions, notice was not properly served. The government responds that this Court properly exercised its discretion in granting the government's several motions to postpone the required service.[2] The government further points out that Defendant was aware of the interceptions as early as May 3, 2006, when discovery, including transcripts of intercepted conversations between Defendant and others, was mailed to Defendant.

---

[2] Attached to the Govt.'s Response to Def.'s Second Supplemental Brief as Exhibits A, B, C and D are the government's applications to delay service and the Court's orders granting delayed service until January 12, 2007.

**IV.**     <u>**Conclusion**</u>

Defendant's Motion to Suppress will be denied.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | |
| RAYMOND MAINOR | : | NO. 06-cr-140-01 |

### ORDER

AND NOW, this 12th day of September, 2007, it is hereby ORDERED that Defendant's Second Motion to Suppress Evidence (Doc. No. 66) is DENIED.

BY THE COURT:

s/Michael M. Baylson

Michael M. Baylson, U.S.D.J.

O:\Criminal Cases\Mainor, Raymong 06-140\Mainor 06-140 Memo Motion Suppress Wiretap.wpd